**In re Kent Alan HOLTORF, Debtor.**

**Kent Alan HOLTORF, Plaintiff,**

v.

**ILLINOIS STUDENT ASSISTANCE COMMISSION, and Education Credit Management Corporation, Defendants.**

Bankruptcy No. 96–00054–B7.

Adv. No. 96–90365.

United States Bankruptcy Court,
S.D. California.

Jan. 9, 1997.

Kent Alan Holtorf, pro se.

David J. Hershman, Chicago, IL, for Illinois Student Assistance Commission.

Robert L. Rennto, Professional Law Corporation, San Diego, CA, for Education Credit Management Corporation.

### MEMORANDUM DECISION AND ORDER

JOHN L. PETERSON, Chief Judge,
District of Montana, Sitting by Designation.

In this adversary proceeding, Debtor/Plaintiff, Kent Alan Holtorf ("Holtorf"), filed on June 5, 1996, a complaint against Defendant, Student Loan Marketing Association ("Sallie Mae"), seeking discharge pursuant to the provisions of 11 U.S.C. § 523(a)(8) of a number of educational loans obtained by Holtorf to finance a course in medical studies. Sallie Mae filed an Answer and a Counterclaim on July 3, 1996. Illinois Student Assistance Commission ("ISAC") filed, together with an answer to the complaint, a motion on July 5, 1996, as Sallie Mae's successor in interest, requesting joinder as a party defendant. On August 1, 1996, the United States of America, Department of Health and Human Services ("HHS"), filed a motion for joinder as a party defendant as well. Sallie Mae also filed on August 1, 1996, a motion requesting to amend the pleadings by striking it as a party defendant and to join additional parties. In the motion, Sallie Mae represented that it had transferred all of the loans at issue, to wit: Five HEAL loans to HHS; eight other loans to ISAC, and finally two loans to California Student Aid Commission, which had further transferred the loans to Education Credit Management Corporation ("ECMC"). The Court entered its Order granting the foregoing motions on August 10, 1996, substituting out Sallie Mae as a party defendant in this action, and adding ISAC, HHS and ECMC as party defendants. In the interim, Holtorf filed an answer to the counterclaims lodged in the proceeding.

Pretrial hearing by telephone conference call was then held on August 15, 1996. The parties appeared at hearing and argument was heard. At the close of hearing the parties agreed to submit a stipulation to the Court clarifying who the appropriate defen-

dants in the action should be. Such stipulation was approved on September 1, 1996. It provided that Holtorf did not contest the non-dischargeability of the HEAL loans owned by HHS, therefore the decision rendered in this adversary proceeding would have no effect on such loans' status, and HHS would be stricken from the action as a party defendant. Finally, ECMC filed November 12, 1996, an answer and counterclaim.

After due notice, hearing in the matter was held December 2, 1996. Holtorf appeared *pro se*. Defendants in the instant proceeding, Adversary Number 96/90365, ISAC and ECMC, appeared through counsel, as did Defendants in Adversary Number 96/90367, Eduserve Technologies, Inc. ("Eduserve") and HEMAR Insurance Corporation of America ("HICA"). At trial, Holtorf and the adversary defendants in both proceedings agreed that the issues of fact and law in both cases overlapped identically, and simultaneous hearing was warranted. Accordingly, the Court takes judicial notice of the records in both cases, and the findings of fact and conclusions of law included herein will apply equally in the instant adversary proceeding and in Adversary Number 96/90367. Holtorf testified on his own behalf, and was then subject to cross examination by all the adversary defendants in appearance. In addition, Holtorf, ISAC and ECMC filed pretrial memoranda in Adversary Number 96/90365; and Holtorf and HICA filed pretrial memoranda in Adversary Number 96/90367. At close of trial all parties indicated further briefing would not be required, and the Court took the matter under advisement. Upon review of the record, the Court finds Plaintiff's complaint fails to satisfy the provisions of 11 U.S.C. § 523(a)(8)(B).

## I.  FACTUAL SUMMARY

From the evidence presented at trial, the Court finds the following facts uncontested. Holtorf took the instant loans to pay for medical education and Holtorf took a medical degree, becoming licensed in the general practice of medicine in California before entering a residency program in the sub-specialty of anesthesiology. In 1994, Holtorf became depressed over his perceptions at his prospects for employment and for repaying his educational loans. Holtorf's depression undermined his motivation to continue in his sub-specialty. In addition, Holtorf began engaging in substance abuse. Eventually, Holtorf dropped-out of the residency program, and embarked upon a general practice of medicine. Due to Holtorf's lack of experience, substance abuse problems, and his early separation from the residency program, however, he could not secure profitable employment as a doctor, and after being terminated for omitting certain deleterious information from his application material for a family practice position in Arizona, Holtorf entered inpatient treatment for substance abuse. In the interim Holtorf let his California medical license lapse. Holtorf continues to hold a provisional medical license in Arizona that allows him to practice medicine, but not prescribe medications. Holtorf currently undergoes treatment for substance abuse by an attending therapists as well as daily meetings with Alcoholics Anonymous.

In addition to the foregoing, the parties do not dispute the level of Holtorf's current income, expenses, which includes $355.00 per month for rent, $150.00 per month on utilities, and $240.00 per month for therapy, or the fact that Holtorf pays $498.98 per month toward a mortgage on his mother's home held in exchange for a loan his parents undertook to help pay for Holtorf's medical education. Finally, Holtorf has applied for deferment of payments due to economic hardship on his educational loans, as well as made minimal payments toward such.

The parties do dispute, however, Holtorf's future in the medical profession. At trial Holtorf testified that, because of his checkered history of substance abuse, the prospects for his obtaining a medical license or for entry into another residency program are utterly hopeless. Holtorf also testified that in order to enter a related field of medicine such as nursing or physician's assistanceship, he would need to begin at the undergraduate level. In addition, Holtorf testified that he has sought employment in medical sales, in which he might apply his specialized training, to no avail. Holtorf also claims to have a

"disability" due to his substance abuse problems. The lenders dispute these averments in their written arguments, contending that Holtorf has at least hopeful possibilities for continuing in medicine or putting his specialized knowledge to profitable use. The only evidence at trial the lenders offered in support of the position, however, was Exhibit 1, a set of Holtorf's responses to discovery requests, and cross-examination of Holtorf.

The Court finds from the evidence that Holtorf has no discernable prospect of ever engaging in the practice of medicine. In addition, Holtorf's post-graduate medical training has little probability of gaining him wage-earning opportunities comparable to those enjoyed by medical doctors in general or family practice. Nevertheless, Holtorf has failed to show that the conditions under which he dropped-out of his residency program arose from any sort of medical condition outside his voluntary control. Thus, the Court finds Holtorf's current financial situation befell him as a result of choices Holtorf consciously made. Once it became clear to him that he should not embark on a career as an anesthesiologist, Holtorf could have taken steps to either secure employment in general practice, in medical research, in medical sales, or in another sub-specialty. Instead, out of pique, frustration or a combination of the two, Holtorf simply abjured any further interest in the medical profession or a related field, and took steps that ensure this decision could not be reversed.

Finally, Holtorf failed to show his substance abuse problems have medically disabled him to the point that he cannot hold gainful employment. Indeed, in Holtorf's pretrial Declaration, Holtorf admits to having plans for a career as a teacher. Thus, while it may present a significant obstacle to Holtorf to repay the educational loan debts at issue over a period of say, thirty years, the Court finds the situation less than "hopeless." Holtorf has no immediate family or other legal dependents for whom he has a legal obligation to care. After his discharge, other than necessary living expenses such as food, shelter and transportation to and from work, Holtorf can commit all of his disposable income to repayment of his educational loans.

## II. DISCUSSION

■ Holtorf has lodged the instant complaint under 11 U.S.C. § 523(a), which provides:

(a) A discharge under section 727, 1141, 1228(a) 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(8) for an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or non-profit institution, or for an obligation to repay funds received as an educational benefit, scholarship, or stipend, unless—

(B) excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents

In an adversary proceeding to determine dischargeability of an educational debt, the debtor has the burden of proof to show evidence of undue hardship sufficient to justify discharge. *Healey v. Massachusetts Higher Educ. (In re Healey)*, 161 B.R. 389, 393 (E.D.Mich.1993); *Rose v. United Student Aids Funds MT (In re Rose)*, 6 Mont.B.R. 110, 111–112 (Bankr.Mont.1988); *Connecticut Student Loan Found. v. Keenan (In re Keenan)*, 53 B.R. 913 (Bankr.D.Conn.1985).

### A. Undue Hardship

The Bankruptcy Code does not define "undue hardship." Courts have held, however, that Congress intended the term to be interpreted strictly, and on a case-by-case basis. *Albert v. Ohio Student Loan Comm'n (In re Albert)*, 25 B.R. 98 (Bankr.N.D.Ohio 1982); *United States v. Brown (In re Brown)*, 18 B.R. 219 (Bankr.D.Kan.1982); *Garmerian v. Rhode Island Higher Educ. Assistance Auth. (In re Garmerian)*, 81 B.R. 4 (Bankr.D.R.I. 1987). As the court in *Brown* noted:

[It] seems universally accepted, however, that "undue hardship" contemplates unique and extraordinary circumstances. Mere financial adversity is insufficient, for

that is the basis of all petitions in bank-ruptcy.

*Brown,* 18 B.R. at 222. In addition:

> [A] loan ... that enables a person to earn substantially greater income over his working life should not as a matter of policy be dischargeable before he has demonstrated that for any reason he is unable to maintain himself and his dependents and to repay the educational debt.

*Report of the Commission of the Bankruptcy Laws of the United States,* House Doc. No. 93–137, Part I, 93rd Cong., 1st Sess. (1973) at 140, n. 14 and 15, reprinted in *Collier on Bankruptcy,* Appendix 2 at PI–i.

Courts have identified several factors and tests when determining "undue hardship." Prior to the adoption of the Bankruptcy Code, the bankruptcy court for the Eastern District of Pennsylvania propounded an oft-cited three-prong undue hardship test was set forth in *Pennsylvania Higher Educ. Assistance Agency v. Johnson,* 5 B.C.D. 532 (Bankr.E.D.Pa.1979). The first prong of the *Johnson* test compares the debtor's financial resources and expenses in light of debtor's education, skills and employment history ("mechanical test"). *Id.* at 537–538. If the debtor passes the first prong, the analysis then moves to the second prong which determines whether the debtor has used his or her best efforts to maximize income and resources and to minimize expenses ("good faith test"). *Id.* at 540. The good faith test requires a debtor to minimize expenditures, by, for example, foregoing a car where public transportation or walking will suffice, or by living with a roommate if "an ordinary person of reasonable prudence" would do so. *Id.* at 541. The debtor further must maximize resources, and in particular maximize employment opportunities, in order to secure "a job which makes the best use of debtor's skills and education, and hence, is likely to return the highest rate of pay." *Id.*

The third prong of the test involves determining whether the debtor's primary purpose for filing bankruptcy is to discharge the educational loan liability and whether the education enhances the debtor's earning capacity ("policy test"). *Id.* at 542. The *Johnson* test is not applied in a vacuum, but requires an analysis of a totality of the circumstances. *In re Johnson,* 5 B.C.D. at 536. As one court noted, "[r]igid adherence by the court to a particular test robs the court of the discretion envisioned by Congress in drafting section 523(a)(8)(B)." *Colemán v. Higher Educ. Assistance Found. (In re Coleman),* 98 B.R. 443, 451 (Bankr.S.D.Ind.1989). If the Debtor satisfies all three prongs of the test, given the totality of the circumstances, the educational debt is discharged.

Since enactment of the Code, the Second Circuit Court of Appeals adopted another test for determining "undue hardship" in the educational loan context. *Brunner v. New York State Higher Education Services Corp.,* 831 F.2d 395, 396 (2nd Cir.1987). According to the Second Circuit, in order to gain discharge under 11 U.S.C. 523(a)(8)(B), a debtor must show:

> (1) that the Debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period for student loans; and (3) that the debtor has made good faith efforts to repay the loans.

*Id.*

The *Johnson* tests and the *Brunner* standards overlap somewhat. *Robinson v. United States (In re Robinson),* 193 B.R. 967 (Bankr.N.D.Ala.1996). Under both, a debtor must, *inter alia,* make a showing of "good faith." As has been discussed, good faith under *Johnson* amounts to a substantial effort to realize opportunities from one's education and resources as well as minimize costs of living. Under *Brunner,* good faith means attempting to repay one's educational loans. One court has described "good faith" under the *Brunner* test as:

> [A] moving target that must be tested in light of the particular circumstances of the party under review.... [T]he characterization of that effort must reflect not only a party's objective conduct, but also the environment in which that conduct occurs. In those instances in which the debtor cannot

maintain a minimal standard of living even without payment of student loans, the demonstration of good faith does not necessarily command a history of payment. It does require a history effort to achieve repayment, such as when a borrower diligently uses a deferment period to attempt the reorganization of her financial affairs. *Maulin v. Salliemae (In re Maulin)*, 190 B.R. 153, 156 (Bankr.W.D.N.Y.1995). In *Maulin* the debtor had insufficient income to support herself and her daughter, and relied on the charity of family members to meet the necessary expenses of life. *Id.* at 155. In addition, the debtor established at trial that she had a disabling back injury that limited her prospects for future employment. *Id.* Nevertheless, the court found that since the debtor had failed to make any payments, and had never requested a deferment of payments while she made efforts to secure employment or a reorganization of her affairs, she could not be said to have made a good faith effort at repayment. *Id.* at 156–157.

A bankruptcy court in the Ninth Circuit has said that a debtor may demonstrate good faith under the *Brunner* test by showing an effort at minimizing monthly expenses, even if he cannot come up with sufficient excess income to pay installments on his educational loans. *Plumbers Joint Apprenticeship and Journeyman Training Committee v. Rosen (In re Rosen)*, 179 B.R. 935, 941–942 (Bankr. D.Or.1995). In *Rosen*, the debtor proved the source of his financial troubles arose from a divorce and a debilitating physical injury, and therefore, the court reasoned, since the debtor had minimized his expenses while living on worker's compensation benefits, and because the majority of his financial troubles arose from no fault of his own, discharge under the § 523(a)(8)(B) was warranted. *Id.*

Finally, a history of payment as short as three years has been held to evidence sufficient *Brunner* good faith to discharge educational loans. *Elebrashy v. Student Loan Corporation (In re Elebrashy)*, 189 B.R. 922, 928–929 (Bankr.N.D.Ohio 1995). In *Elebrashy*, a debtor the court found to have no hope of repaying educational debt had nevertheless completed a 36 month Chapter 13 Plan, including payments on the educational

loans, in an effort to reorganize his financial picture. *Id.* at 929. Such efforts, the court found, evidenced sufficient good faith to satisfy the requirements of the *Brunner* test. The court specifically found that no evidence in the record suggested that the debtor had any but good faith efforts in pursuing his medical career goals. *Id.* Rather than drop-out of his residency program, the debtor had flunked-out. This served to reinforce rather than undermine the conclusion that debtor had made a good faith effort to succeed in a career where he would be able to repay his educational loans. *Id.*

### B. Application

This Court finds that in the particular circumstances *sub judice,* application of the good faith test—as employed under the holdings of either *Johnson* or *Brunner*—disposes of the issues in the instant proceeding. Under the *Johnson* good faith test, Holtorf first has failed to show that he has made best efforts toward securing a highest-possible income. *Johnson,* 5 B.C.D. at 541. When Holtorf fell into the view that the field of anaesthesiology held no future, rather than seek ways to utilize the balance of his medical education, and indeed, his medical license, Holtorf simply surrendered himself to "depression" and despair, under which it became a daily agony simply to arise from bed. Holtorf, however, has produced no credible evidence that this alleged mental condition arose from some psychological or physiological condition beyond his control. In addition, even from Holtorf's subjective point of view, he has failed to show why the speculative news that he may not be able to secure employment in his chosen field of specialty would have caused his complete emotional and psychological collapse, or even substantial evidence that such a collapse actually even occurred. Absent such a showing, Holtorf has no excuse for not attempting to make best use of his years of medical training and his California medical license, and therefore fails the first prong of the *Johnson* good faith test. The meager efforts Holtorf has undertaken to secure part-time, unskilled employment in totally unrelated fields, and then only after allowing himself to slip to a point where salvage of a medical career has

become impossible utterly fail to approach the "best use" of Holtorf's skills and education in an effort to secure his "highest rate of pay." *Id.*

Furthermore, under the *Johnson* test, Holtorf has failed to establish that he has minimized expenditures, although this is a closer call. *Id.* Holtorf, who is single, has chosen to live with a roommate rather than alone, in order to minimize rent and utilities. In addition, Holtorf spends little or no money on wardrobe and recreation. The problem with Holtorf's expenses, however, stems from Holtorf's $498.98 per month payment on a mortgage held against his mother's house. Such payment stems from a loan Holtorf's parents took to help pay for his medical education. There is no evidence in this record, however, that Holtorf bears any legal responsibility for repayment. Moreover, Holtorf has made no showing of his mother's financial resources, or that she in any way depends on his contributions to ensure repayment of the loan. Holtorf testified that he had lived in the home, in which case, the payment could reasonably have been said to substitute for rent. Yet, Holtorf left the home to move to Arizona to take a medical job. His prospective employer, however, terminated him before he could start. At that point, Holtorf could have avoided his current rent expense of $355.00 per month by the "ordinary prudence" of moving back into his mother's home. *Id.* By not doing so, Holtorf has failed to show that he has minimized expenses, and therefore he fails the second prong of the *Johnson* good faith test.

With regard to the third prong, maximizing resources prong of the *Johnson* test, the Court finds that Holtorf, as a single person without family obligations on his leisure time, has failed to show how working 20 hours per week fulfills his "duty to obtain any funds he or she can, so as to repay the debts he owes." *Id.* Even assuming *arguendo* that Holtorf had no future in medicine when he dropped out of residency, or that minimum wage jobs such as data entry are all that he can currently maintain, Holtorf has the duty to obtain at least full-time or multiple part-time employment equivalent to 40 hours per week, if not more. Holtorf successfully completed

over a decade of higher education toward a sophisticated medical sub-specialty before dropping out for no excusable reason, demonstrating a capacity for hard-work and the other responsibilities of a valuable worker. Without a showing that such capacity has been substantially diminished, through mental or physical injury or disease, he must have used these merits to a reasonable extent in an effort to repay his loans before the Court can hold that he has maximized his resources under the *Johnson* good faith analysis.

The foregoing analysis applies equally to the *Brunner* good faith analysis. Courts have said that:

> This test encompasses the notion that a "debtor may not willfully or negligently cause his own default, but rather his condition must result from 'factors beyond his reasonable control.'"

*Elebrashy,* 189 B.R. 922 (Bankr.N.D.Ohio 1995) (quoting *Matter of Roberson,* 999 F.2d 1132, 1136 (7th Cir.1993), citations omitted). The Court finds, for the reasons laid out above, Holtorf has failed to show the conditions that led to the financial situation in which Holtorf currently finds himself were outside of his direct, reasonable control. *See Rosen,* 179 B.R. at 941. For instance, Holtorf dropped out of residency, and refused to pursue other options to use his medical license. *See Elebrashy,* 189 B.R. at 929. In addition, while the Court finds from the foregoing that Holtorf has made minimal payments on his educational loans and requested deferments of such, he did not accompany these measures with *bona fide* attempts to get on his financial feet and make at least partial payment. Thus Holtorf made no good faith efforts to attempt repayment of his educational loans. *Id.; Maulin,* 190 B.R. at 156. Consequently, the Court concludes that Holtorf has failed to satisfy the good faith analysis of the *Brunner* case. 831 F.2d at 396.

## III. CONCLUSION

While completing a residency in the medical sub-specialty of anaesthesiology, Holtorf became disconsolate about his prospects for employment and later repayment of his edu-

cational loans. This condition led him to become distracted from his studies. At the same time, Holtorf began abusing substances. At some point, at his own behest as much as the program's, Holtorf separated from the residency program. Holtorf also allowed his California medical license to lapse, and neglected the requirements of the medical profession to the point where he can no longer hope to pursue such a career. Meanwhile, Holtorf works only part-time and spends some $500.00 per month on the expenses of his mother, who is not legally dependent on him. Thus, the Court finds that Holtorf has failed to maximize his income potential, to maximize his resources, to minimize his costs, or to make reasonable efforts to either attempt to repay or to defer his student loans while making a serious effort to find suitable work or reorganize his debts. Accordingly, pursuant to 11 U.S.C. 523(a)(8)(B), Holtorf has failed the good faith analysis for discharge of educational loans under the holdings of both *Johnson,* 5 B.C.D. at 536, and *Brunner,* 831 F.2d 395. This Memorandum Decision and Order constitutes findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052. Defendants, Illinois Student Assistance Commission and Education Credit Management Corporation, are ORDERED to file with the Clerk of Court a judgment against Plaintiff, Kent Alan Holtorf, in conformance with the Memorandum Decision within ten days from entry hereof.