**In re Rebecca SWINNEY, Debtor.**

**Rebecca Swinney, Plaintiff,**

**v.**

**Academic Financial Services, et al., Defendants.**

**Nos. 00–3195, 00–32676.**

United States Bankruptcy Court, N.D. Ohio.

Sept. 19, 2001.

Howard B. Hershman, Toledo, OH, for plaintiff.

Matthew J. Thompson, Columbus, OH, for Educational Credit Management Corp.

### DECISION AND ORDER

RICHARD L. SPEER, Chief Judge.

The above-captioned adversary case comes before the Court after a Trial on the Plaintiff/Debtor's (hereinafter referred to as the "Debtor") Complaint to determine the dischargeability of a debt. The specific debt at issue is a student loan obligation which was incurred by the Debtor to obtain a Bachelor of Science Degree in psychology from the Liberty University of Life Long Learning. At the Trial, it was established that the amount in controversy was Nine Thousand Seven Hundred Nine and 78/100 dollars ($9,709.78), the obligation of which, according to the Debtor, is dischargeable based upon the "undue hardship" exception to nondischargeability contained in 11 U.S.C. § 523(a)(8).

With respect to her compliance with the "undue hardship" standard of § 523(a)(8), the Plaintiff's case fundamentally centers around her contention that she has two mental disabilities: multiple personality disorder and post-traumatic stress syndrome. According to the Debtor, these mental conditions have greatly impacted her ability to pay her student loan obligations. In this regard, the Debtor, at the Trial held on this matter, asserted to the Court these particular concerns:

She has been receiving treatment for her mental conditions for the past eleven (11) years.

Her mental conditions, at least in part, stem from her being raped by an uncle, who, as a direct consequence therefrom, is required to help pay for her psychiatric treatments.

As a result of her mental difficulties, she has, at least on one prior occasion, voluntarily hospitalized herself.

She currently takes medications for her mental disorders.

Her multiple personality disorder causes her to experience personalities as young as six (6) years of age.

Stress, which is partially brought about by her student loan obligations, greatly aggravates the symptoms associated with her mental conditions.

She has suffered physical problems as a result of her mental conditions; in particular, a significant amount of weight gain. In addition, the Debtor related to the Court that intertwined with her mental condition is a proclivity to abuse alcohol,—e.g., binge drinking—a condition for which she has also received treatment.

As for how her mental conditions have specifically affected her ability to pay her student loan obligations, the Debtor related to the Court that it has been difficult, if not impossible for her to maintain any sort of permanent employment. By way of a specific example, the Debtor testified that she has not received any employment income for the past eighteen (18) months, a situation which the Debtor does not foresee changing in the near future. To support herself, testimony was given to the effect that the Debtor relies on the help of two (2) individuals who provide financial support; the amount of this help ranges from One Thousand dollars ($1,000.00) to One Thousand Five Hundred dollars ($1,500.00) per month.

In opposition to the Debtor's entitlement to receive an "undue hardship" discharge of her student loan obligations, the Defendant/Creditor, Educational Credit Management Corporation (hereinafter referred to as the "Creditor"), raises what are essentially three different issues. First, the Creditor questions the Debtor's inability to obtain employment. In this regard, the Creditor referred to the evidence in this case which clearly shows that the Debtor has, in the past, made payments on her student loan obligations while at the same time maintaining relatively steady employment. Second, the Creditor specifically calls into question whether the Debtor's alleged mental illnesses are actually severe enough to affect her ability to repay her student loans. In support of this position, the Creditor called the Court's attention to two facts: the Debtor was recently denied disability pay by the Social Security Administration; and absolutely no medical evidence substantiating the Debtor's mental illnesses was offered to the Court. In this same vein, the Court questioned the Debtor as to how, given the supposed severity of her mental illnesses and related alcohol problems, she could continue to operate a motor vehicle. Finally, in opposition to the Debtor's entitlement to receive a discharge of her student loan obligations, the Creditor called into question

the Debtor's good faith; in particular, the Debtor's refusal to enter into an income contingent repayment program offered by the Creditor along with the Debtor's reaffirmation of an automobile debt.

## LEGAL DISCUSSION

For reasons of public policy, Congress chose to exclude from the scope of a bankruptcy discharge those debts incurred by a debtor to finance a higher education. In enacting this exception to discharge, however, Congress recognized that some student-loan debtors were deserving of the fresh-start policy provided for by the Bankruptcy Code. As a result, Congress provided that a debtor could be discharged from their educational loans if it were established that excepting the obligations from discharge would impose an "undue hardship" upon the debtor and the debtor's dependents. *Grine v. Texas Guaranteed Student Loan Corp. (In re Grine)*, 254 B.R. 191, 196 (Bankr.N.D.Ohio 2000). Specifically, § 523(a)(8) states that:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents[.]

As used in § 523(a)(8), however, the term "undue hardship" is not actually de-fined. As a result, various tests have been developed by the courts to determine whether "undue hardship" exists under any given set of factual circumstances. In this regard, this Court, in accord with those prior decisions rendered by the Sixth Circuit Court of Appeals,[1] has employed what has become to be known as the Brunner Test to determine whether a debtor is entitled to an "undue hardship" discharge of his or her student loan obligations.

■ Under the Brunner Test, which is named after the case of *Brunner v. New York State Higher Educ. Serv. Corp.*, a debtor must establish the existence of each of the following three elements, by a preponderance of the evidence, in order to be entitled to an "undue hardship" discharge under § 523(a)(8):

(1) the debtor cannot maintain, based on current income and expenses, a 'minimal' standard of living for herself and her dependents if forced to repay the loans;

(2) additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period; and

(3) the debtor has made good faith efforts to repay the loans.

831 F.2d 395 (2nd Cir.1987). In this case, given that the Debtor is presently reliant on third parties for financial support, it does not appear that any dispute exists with respect to the Debtor's compliance with the first prong of the Brunner Test. Accordingly, the Court will begin its analysis with whether the Debtor has met her burden under the second prong of the Brunner Test.

---

**1.** These case are, *Cheesman v. Tennessee Student Assistance Corp. (In re Cheesman)*, 25 F.3d 356 (6th Cir.1994), and *Tennessee Student Assistance Corp. v. Hornsby (In re Hornsby)*, 144 F.3d 433 (6th Cir.1998).

■ The second prong of the Brunner Test requires that a debtor's financial adversity be more than a temporary state of affairs. *Hatfield v. William D. Ford Fed. Direct Consolidation Program, et al. (In re Hatfield)*, 257 B.R. 575, 582 (Bankr. D.Mont.2000). The purpose for this requirement is to give effect to the clear congressional intent—exhibited by utilization of the word "undue" in § 523(a)(8)—that a student loan obligation be more difficult to discharge than that of other nonexcepted debts. *Rifino v. United States (In re Rifino)*, 245 F.3d 1083, 1088–89 (9th Cir.2001). In this case, the Debtor argues that she has complied with this requirement on account of the fact that she suffers from at least two mental illnesses which, in turn, have greatly impeded her ability to earn a living.

■ For purposes of the second prong of the Brunner test, a mental illness, if sufficiently debilitating and unlikely to improve, can provide the basis for discharging a student loan debt. *See, e.g., Green v. Sallie Mae Servicing Corp. (In re Green)*, 238 B.R. 727, 737 (Bankr.N.D.Ohio 1999) (debtor diagnosed with bipolar disorder entitled to hardship discharge of student loan debt); *Meling v. United States of America (In re Meling)*, 263 B.R. 275, 279 (Bankr.N.D.Iowa 2001) (debtor with bipolar disorder discharged of student loans). However, in line with the Congressional policy of making student loans more difficult to discharge, substantial credible evidence must be given which supports the existence of the mental illness. *See, e.g., Hatfield v. William D. Ford Fed. Direct Consolidation Program, et al. (In re Hatfield)*, 257 B.R. 575, 581–82 (Bankr. D.Mont.2000). Although such evidence does not have to necessarily consist of extensive expert testimony, such evidence should consist of more than simply bare allegations; that is, whenever a debtor's

health, whether mental or physical, is directly put at issue some corroborating evidence must be given supporting the proponent's position. *See,* FED R.EVID, 701. For example, if properly authenticated, letters from a treating physician could be utilized.

■ In this case, however, the Debtor, beyond her self-supporting statements, did not introduce any evidence of her mental illnesses. In fact to the contrary, it was clearly shown that the Debtor's mental difficulties do not rise to the level to enable the Debtor to qualify for Social Security Disability benefits. Furthermore, and also along this same line, the Court questions the validity of the Debtor's statements regarding the debilitating nature of her mental condition(s). In particular, the Debtor, while not working, still seems to be able to perform most of the functions necessary to function in society. For example, the Court takes note of the fact that the Debtor, despite her alcohol problems and potential to take on the personality of a six (6) year old, still considers herself fit enough to operate a motor vehicle on a regular basis. Therefore, given the lack of credibility which the Court can attach to the Debtor's testimony, in conjuncture with the lack of corroborating evidence the Debtor introduced concerning her mental illnesses, the Court cannot find that the Debtor has met her requisite burden under the second prong of the Brunner Test. Accordingly, the Debtor's student loan obligation to the Creditor will not, on the basis of "undue hardship," be discharged under § 523(a)(8).

■ The Court's analysis, however, does not end there as under appropriate circumstances a debtor, although not entitled to a hardship discharge under § 523(a)(8), may still be entitled to have the terms of their student loan changed by the court (i.e., a reduction in the loan

amount) so that the debtor may obtain some of the benefits of a bankruptcy discharge. As explained by the Sixth Circuit Court of Appeals in *Tennessee Student Assistance Corp. v. Hornsby (In re Hornsby)*;

> Although the bankruptcy court should not have discharged the ... entire student loans, we believe it had the power to take action short of total discharge. We find this authority in 11 U.S.C. § 105(a), which permits the bankruptcy court to 'issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title,' so long as such action is consistent with the Bankruptcy Act. In a student-loan discharge case where undue hardship does not exist, but where facts and circumstances require intervention in the financial burden on the debtor, an all-or-nothing treatment thwarts the purpose of the Bankruptcy Act.

144 F.3d 433, 438–39 (6th Cir.1998) (internal citations omitted). However, notwithstanding this holding, not every debtor who seeks bankruptcy relief is entitled to receive a partial discharge of their student loan obligations, or otherwise have a bankruptcy court change the terms of their student loan debt. Instead, this Court, in applying the Sixth Circuit's holding in *In re Hornsby*, has held that it will only invoke its equitable powers under § 105(a), so as to partially discharge a student loan debt, if it finds that the equities of the situation tip distinctly in favor of the debtor. *Fraley v. U.S. Dep't of Ed. (In re Fraley)*, 247 B.R. 417, 422 (Bankr. N.D.Ohio 2000); *Grine v. Texas Guaranteed Student Loan Corp. (In re Grine)*, 254 B.R. 191, 196 (Bankr.N.D.Ohio 2000). This principle is based on the simple legal maxim that one who seeks equity must also do equity. In the instant case, however, after giving the matter careful consideration, the Court cannot find that the

Debtor has met this standard. This reason for this, as the following will explain, centers around the Debtor's decision not to participate in an income contingent repayment program offered by the Creditor.

 The federal income contingent repayment program is a device which allows student-loan debtors, who have little or no income, a means by which to pay their student loan obligations. In greater detail, the program can be explained as this:

> a borrower may qualify for an Income Contingent Repayment Plan, where the amount of the required monthly payment is recalculated yearly based on the borrower's Adjusted Gross Income, family size and the "poverty guidelines" promulgated by the United States Department of Health and Human Services. The repayment period covers a maximum of 300 months. The amount of payments are dependent on the borrower's income and payment may not be required at all during times when the borrower has little income. The balance remaining after the 300–month period is deemed forgiven.

*England v. United States of America (In re England)*, 264 B.R. 38, 44 (Bankr.D.Idaho 2001). Thus, as the above statements illustrate, the income contingent repayment program provides a student-loan debtor an equitable way to pay a debt that would otherwise be or later become unmanageable. However, given the equitable nature of the program, it is a difficult, although not necessarily an insurmountable burden for a debtor who is offered, but then declines the government's income contingent repayment program, to come to this Court and seek an equitable adjustment of their student loan debt. *See, Ritchie v. Northwest Educ. Loan Assn. (In re Ritchie)*, 254 B.R. 913, 923 (Bankr.D.Idaho

2000) (ability to pay under income contingent repayment program may render a student loan obligation nondischargeable); *Douglass v. Great Lakes Higher Educ. Servicing Corp. (In re Douglass)*, 237 B.R. 652, 657 (Bankr.N.D.Ohio 1999) (failure to accept an offer from the government's income contingent repayment program may be tantamount to abuse of the bankruptcy process). This is especially true considering that a debtor with little or no income is only required to make de minimis payments under the income contingent repayment program. As a consequence, a significant viable reason must be offered by a debtor who, after being offered an opportunity to participate in the government's income contingent repayment plan, seeks an adjustment of their student loan obligation. By way of example, in *In re England*, 264 B.R. 38 (Bankr.D.Idaho 2001), the court invoked its equitable powers under § 105(a) so as to partially discharge a student loan obligation despite the availability of the income contingent repayment program. In doing so, however, the bankruptcy court was persuaded that exceptional circumstances existed in the case. This determination was largely based on the fact that the debtor and the debtor's daughter suffered from serious medical problems which, by causing the debtor's income to greatly fluctuate, impeded the debtor's ability to make payments under an income contingent repayment plan that only took into account the debtor's income while healthy. *Id.* at 52.

With these particular principles in mind, however, the Court could not discern from the record of this case any exceptional circumstances which would justify the Debtor not accepting the government's offer to participate in its income contingent repayment program. Moreover, the Court notes, with some consternation, that the Debtor, although not able to accept the government's offer to participate in the income contingent repayment program, still found it a viable option to reaffirm on a debt for her automobile. Therefore, given these considerations, the Court at this time declines to invoke it equitable powers under § 105(a) so as to provide the Debtor with an equitable adjustment of her student loan obligations. In reaching the conclusions found herein, the Court has considered all of the evidence, exhibits and arguments of counsel, regardless of whether or not they are specifically referred to in this Decision.

Accordingly, it is

**ORDERED** that the student loan obligations of the Plaintiff, Rebecca Swinney, to the Defendant, Educational Credit Management Corporation, be, and are hereby, determined to be nondischargeable debts pursuant to 11 U.S.C. § 523(a)(8).